NOTICE
Decision filed 07/17/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260128-U

NO. 5-26-0128

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* Z.B.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-89 |
| | ) | |
| Demetrius W., | ) | Honorable |
| | ) | Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Vaughan and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's order terminating Father's parental rights was not against the manifest weight of the evidence where the State met its burden of proving that Father was unfit to parent and that termination was in the best interest of the minor. Therefore, the circuit court's orders making a finding of unfitness and terminating parental rights are affirmed.

¶ 2    Demetrius W. (Father), appeals the January 30, 2026, order terminating his parental rights, arguing that the circuit court erred in finding him to be unfit. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On September 7, 2022, the State filed a petition for adjudication of abuse, neglect, or dependency as to Z.B.D, the minor. Father was listed as the putative father on the petition, and Tangula B. (Mother) was listed as the mother. The petition alleged that the minor was neglected

1

in that his environment was injurious to his welfare due to being exposed to the abuse of his siblings when residing with Mother, and that Mother created a substantial risk of physical injury to the minor. 705 ILCS 405/2-3(1)(b); 2-3(2)(ii) (West 2020).

¶ 5    The circuit court held a shelter care hearing the same day and Father appeared via video from the Champaign County Correctional Center. The court found that the minor was neglected and abused because Mother permitted her paramour, Aaron O., to live with her, and Aaron "regularly beats her children, including the minor, causing injuries." The minor was placed in the temporary custody of the Department of Children and Family Services (DCFS).

¶ 6    Father was ordered to complete DNA testing to establish parentage on September 9, 2022.[1] The circuit court found Father to be the minor's biological father based on the results of the DNA test on January 12, 2024.

¶ 7    On April 5, 2023, the circuit court held a dispositional hearing. The circuit court found it in the best interest of the minor to be made a ward of the court and adjudged neglected. As to Father, the court found that he was unfit and unable to parent the minor, specifically because Father was "incarcerated and unable to exercise custody" and he had a "history of serious criminality."

¶ 8    The circuit court reviewed the case four times, from the dispositional hearing to the State's motion to find Father unfit and terminate his parental rights. On August 3, 2023, the court found that Father did not make reasonable efforts or reasonable and substantial progress toward reunification. Father had been released from custody on May 22, 2023, but did not contact DCFS and did not have visitation established. On November 2, 2023, and February 1, 2024,[2] the court found that Father made reasonable efforts, but failed to make reasonable or substantial progress.

---

[1]Father appealed this order, which was later affirmed by the appellate court on September 26, 2023, for want of a meritorious issue. *In re Z.B.D.*, 2023 IL App (5th) 230286-U.

[2]The record on appeal does not contain permanency hearing reports from DCFS or a transcript for the hearings on these dates.

¶ 9    On May 17, 2024, the court found that Father made reasonable efforts but failed to make reasonable and substantial progress. According to a DCFS permanency hearing report filed on April 29, 2024, Father made contact with DCFS but was homeless and unemployed. Father had a criminal history including assault, dangerous drugs, sexual assault, and weapon offenses. Due to Father's sexual offense, he was recommended to complete a sexual abuse assessment, which was completed, but Father refused to provide a copy of the report of the assessment or sign a consent form after his initial form was misplaced by the Center for Youth and Family Solutions (CYFS). During the permanency review hearing, Father, proceeding *pro se*, stated that he refused to sign a new consent form, but he was enrolled in counseling as a result of the sexual assault assessment. Father also provided a parenting course certificate of completion during the hearing. The State argued that Father was not completing any of his required drug drops, as he appealed the service and was noncompliant while awaiting the outcome. Father also did not provide any information about his mental health counseling to his caseworker. The circuit court stated that Father did not make reasonable and substantial progress due to his failure to complete drug screens, refusal to sign necessary consent forms, and housing and employment instability.

¶ 10    On November 7, 2024, the State filed a motion seeking a finding of unfitness and termination of Father's parental rights.[3] The motion alleged three counts of unfitness. Count I alleged that Father failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor. 750 ILCS 50/1(D)(b) (West 2022). Count II alleged that Father failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor during any nine-month period following the adjudication of neglect or abuse, namely, February 7,

---

[3]On October 31, 2024, Mother signed an adoption consent, and the circuit court entered an order on her surrender of her parental rights.

2024, to November 7, 2024. *Id.* § 1(D)(m)(i). Count III alleged that Father failed to make reasonable progress toward the return of the minor to him during any nine-month period following the adjudication of neglect or abuse, namely February 7, 2024, to November 7, 2024.

¶ 11 The matter proceeded to a hearing on the petition, which was held over multiple dates occurring on April 3, June 3, June 5, August 21, August 28, October 23, November 13, and December 19, 2025. The circuit court, on the State's motion, took judicial notice of the adjudication and dispositional orders, as well as the complaints, orders, and findings in Champaign County case Nos. 2020-CF-499 (conviction for criminal sexual assault), 2012-CF-585 (conviction for aggravated discharge of a firearm), 2008-CF-2286 (conviction for aggravated driving under the influence), and 2000-CF-27 (conviction for battery).

¶ 12 The State first called Kaitlyn Saathoff, who was a clinical supervisor at Community Resource and Counseling Center (CRCC). She provided sex offender treatments and evaluations, and she evaluated Father in October 2023. The evaluation report was entered into evidence. Saathoff testified that despite pleading guilty to a sexual offense, Father denied any guilt and stated that he only pled guilty "due to issues that he was having while incarcerated." The sexual offense was criminal sexual assault of an autistic 17-year-old. The report included that Father posed a moderate risk to sexually reoffend. The factors impacting his risk include the possible presence of a major mental illness, housing and employment instability, sexual preoccupation, elevated psychopathy score,[4] impulsivity, and lack of responsibility for his actions. Saathoff testified that she recommended Father complete sex offender treatment as a result of his interview and history, as well as mental health counseling. He was offered treatment at CRCC through group and

---

[4]The report stated that the psychopathy checklist "uses both interviews and the review of collateral information to provide a dimensional score that represents the extent to which an individual is judged to match the prototypical psychopath." Father's psychopathy interview indicated that "he is willing to use others to have his needs met and that he has been living a fairly chaotic and aimless lifestyle."

4

individual sessions. Father attended group sessions between February and May 2024 but was unsuccessfully discharged due to his failure to participate. When Father did participate, he was "very defensive" and would get angry.

¶ 13    The State then called Jeff Reynolds, the program director at CRCC, who supervises the sex offender treatment and assessment program. The State admitted into evidence a progress report written by Reynolds at Father's request on April 30, 2024. The report stated that Father attended group sessions from February to April, but he continued to "deny the allegations that he pled guilty and does not seem to be interested in addressing any possibility that his behavior might have played a role in the accusations." Reynolds described Father's unwillingness to examine his behavior as "troubling" and that he viewed himself as the victim. Father also expressed his "non-traditional, unhealthy, and perhaps illegal" sexual beliefs, including polygamy. Father's treatment progress was poor, and he took no responsibility for the offense. When Reynolds provided the report to Father, he became irritated and agitated, then called Reynolds "a lying bag of trash and became loud and challenging." Father insulted the parole agent in the treatment room at the time, then left the treatment program after this interaction.

¶ 14    The State admitted another exhibit, which was a letter sent by Reynolds to Jeremy Jessup, Father's probation officer, which indicated that Father was no longer receiving sex offender treatment because Reynolds "did not believe that we have a way to therapeutically move forward with [Father]." In addition to the interaction of receiving the progress report, Father stated that he would never again "share anything relevant about his life with the treatment providers."

¶ 15    Reynolds stated that for offenders who deny the underlying allegations, the program attempts to talk with them "about what role their behavior played in getting falsely accused," but Father was unwilling to participate in this type of approach because "he [did not] think that he had

5

any behaviors that needed to be changed." Reynolds recommended in his letter to Jessup that Father should be referred to another treatment provider. On Father's participation in the group sessions, Reynolds testified that the providers were "surprised" at his beliefs about polygamy, "while he required his partners to be monogamous." Reynolds stated that these beliefs were "an indication of a sexual entitlement," which was a risk of re-offense. Reynolds testified that a sex offender assessment "gets stale" after 12 months if the individual did not engage in any treatment as a result of the assessment. Reynolds opined that based on his interactions with Father, it was unlikely that he could have successfully completed his treatment by November 7, 2024. Reynolds believed that if Father had been willing to address his behavior that might have played a role in the accusations against him, it would have allowed him to make progress in his treatment.

¶ 16 The State then called Phillip Ogwal, a therapist employed by CYFS who was assigned to be Father's therapist in May 2024. Ogwal completed a report on October 21, 2024, on Father's progress in therapy, which was admitted into evidence. Father attended sessions from May to October 2024 but missed five due to moving to Chicago, transportation issues, and an emergency room visit. The main goals of Father's therapy were managing his posttraumatic stress disorder (PTSD) symptoms and his experience in prison. There was not a goal for any type of sexual offenses or behaviors from Father. Father did discuss the minor and his desire to regain custody during his sessions as well. Father made progress during his session by engaging with Ogwal and practicing the techniques he learned. Ogwal testified that Father made progress in managing his symptoms, decision-making process, and feeling safe to trust others, and Father would have to continue working on those symptoms.

¶ 17 The State then called Jamie Martin, a CYFS case worker who was assigned to Father's case from March 2023 to May 2024. At the beginning of the case, CYFS was unable to reach

Father because his whereabouts were unknown after he was released from custody. After CYFS made contact, Father signed a consent form for CYFS to obtain a copy of his sexual abuse assessment from his probation officer in August or September 2023 and he completed an integrated assessment in November 2023. CYFS misplaced the initial consent form and asked Father to sign another in January 2024 but he refused. Father informed Martin that he did not want CYFS or the State to have access to the assessment because "he was appealing his conviction" and that it "wasn't his fault that it was lost, so he was not going to sign a new one." Martin testified that she told Father that because of his history, CYFS recommended a sexual abuse assessment, and if the agency could not gain access to it, CYFS would refer for another assessment to be completed through the agency. Martin informed Father that without the consent form, he could not move toward the goal of returning the minor home. Martin attempted to work with Father's probation officer, Jessup, but was unable to do so due to the lack of a consent form. Martin stated that CYFS did not request an assessment initially because he had completed it through probation, and it would have been "silly" to have him do the same assessment twice.

¶ 18    Martin testified that Father was engaged in parenting classes, but he did not consistently cooperate with drug drops because he did not understand why they were necessary, even though Martin explained that they were court ordered. During the relevant time period, 11 drops were scheduled, 2 of which were negative and 9 were "failure to appear." Father was unemployed and did not have stable housing. Father had visitation with the minor once a week for two hours, which generally went well, but the minor appeared anxious about his future when Father asked if the minor wanted to live with him. When Martin was transferred off Father's case assignment, CYFS was not close to returning the minor to Father because "services were just getting started, and we were not able to determine if there were any additional recommendations or safety concerns

regarding the sexual abuse assessment." Martin did not make a referral for a sexual abuse assessment.

¶ 19    The State called Austin Schmohe, a CYFS case manager assigned to Father's case in March 2024. He testified that in March 2024 Father was participating in parenting classes and visitation, and started mental health services in June or July. Father did not cooperate with his drug drops or a sex offender treatment course, again refusing to sign an additional consent form. Father was still unemployed and was registered as homeless in Champaign, but CYFS suspected Father was actually residing in Chicago due to the agency purchasing train tickets for Father's visitation from Chicago. Father missed a few visits due to an assault incident and he was hospitalized as a result, but did not provide details of the assault to Schmohe. In June or July 2024 Father signed a new consent form for Jessup which allowed CYFS to receive a copy of the sex offender risk assessment in August 2024. Schmohe stated that Father informed him that he had been unsuccessfully discharged from the sex offender class and was seeking a different service provider. Schmohe did not have any way to confirm that Father was complying with his probation until August 2024.

¶ 20    Schmohe testified that in November 2024 CFYS was not close to returning the minor into the care of Father because he did not have a stable residence and did not complete all of his services. Father's visitation was agency supervised, and the frequency or length of the visits did not increase. Schmohe did not recall Father bringing the minor any gifts, letters, or cards during visits. Father was married and had another child, but sibling visits with his other child were denied due to the lack of progress. Father missed a few visits due to transportation issues because his location was registered in Champaign, but he requested round trip train tickets from Chicago for visits. Once Father updated his location to Chicago, CYFS purchased the round trip tickets for

8

visitation. Father missed eight visits, two for short notice, three for transportation issues, and two for a medical emergency.

¶ 21 Sex offender treatment was added to Father's service plan after Father was released from probation on September 5, 2024. The October 14, 2024, service plan included that Father needed to participate in an updated sex offender assessment and treatment to determine what services would be necessary. Father was not informed of the added service until after November 7, 2024, because Schmohe did not think it would have been appropriate to tell Father of the change over the phone and CYFS had scheduling issues with Father. However, Father was aware throughout the case that he was supposed to cooperate with probation, and sex offender treatment was a condition of probation. Overall Schmohe opined that Father was not capable of providing minimum parenting standards by November 2024 due to his "lack of stable housing, lack of stable income, as well as not just the lack of completion of the sex offender treatment course but his lack of willingness to complete the required services, and his lack of willingness, I mean, across the board for—for not just the sex offender treatment, but the *** drug tests and everything. *** [I]t was, yes, due to a lack of completion of them, but also just a lack of, you know, demonstration of willingness to."

¶ 22 The State called Michael Kleppin, a forensic therapist whose practice focused primarily on sexual offenders. Father reached out to Kleppin in May 2024 to schedule an evaluation, but an appointment was never made due to Kleppin's rapidly filling schedule and communication issues. When Kleppin informed Father of scheduling inability, Father seemed frustrated, and Father's text messages "included statements of being involved in corruption or conspiracy." Kleppin informed Jessup, who initially referred Father, that Kleppin would not see Father due to the scheduling difficulties and Father's "adversarial positioning."

¶ 23    The State presented no further witnesses. Over Father's objection, the State entered into evidence a certified copy of Father's conviction in Champaign County case no. 2020-CF-499, the case in which Father plead guilty to criminal sexual abuse.

¶ 24    Father called a close friend, Taishima Moore, to testify on his behalf. Moore regularly spoke with Father during the relevant time period about his visitation with the minor, and Moore would encourage Father to continue taking steps to receive custody. Moore observed Father to be "patient, loving, understanding, and nurturing" during interactions with Father and his other son. Moore stated that Father's housing was unstable during the time period because he was unable to find housing due to being on the sex offender registry.

¶ 25    Father's wife, Ashley Davis, testified that they had been married since 2023 and had an eight-year-old son together, Demetrius W. (DJ). She worked and lived in Champaign after she graduated college in 2015, and Father was a "full-time" parent when DJ was born. Davis later moved to Chicago for work. Father worked "side jobs" and donated plasma for income during the relevant time period and would drop off and pick up DJ from school. Davis stated that Father always tried to make every visit with the minor, and the agency kept "adding on" requirements. Davis and DJ never participated in visitation or other services with Father. Davis described Father as "hardworking [and] determined." Davis was aware that Father had pleaded guilty to sexual abuse. Father never lived with Davis in Chicago, and she paid for Father to stay at a hotel in Urbana. Father only came to Chicago when "he had to meet up for legal stuff."

¶ 26    Father's cousin, Andrea Elion, testified that she kept in touch with Father during the relevant time period about the possibility of Father losing custody of the minor. Elion stated she thought Father was "very structured, very routine," but she had never met the minor in person. Elion stated that Father was a great role model for children, and she trusted him "one hundred

10

percent with children." She was not aware that Father was a registered sex offender or that he had pled guilty to criminal sexual abuse.

¶ 27 Father testified on his own behalf. Father was 38 years old and had recently moved into an apartment in Chicago. Father was not involved in the minor's life when he was born due to relationship issues. Father testified that he pled guilty to criminal sexual abuse so he could "get out of jail and try to get [his] son." As a result of his plea, Father was required to register as a sex offender and complete sex offender classes, as well as therapy.

¶ 28 During the relevant time period, Father was homeless "most of the time." He lived in a hotel that his wife paid for, as Father's only source of income at the time was plasma donation. Father stated that he was focused on four *pro se* pending lawsuits against Champaign County, and it would have been "impossible" to focus on his lawsuits and work at the same time.

¶ 29 Father stated that he completed his interview for the sex offender assessment before enrolling in the classes. Father described the interview as "uncomfortable" and that he was "really irritated" that he had to complete it. Further, he did not learn anything from the classes because it "didn't apply" to Father. As to the progress report Father requested, he stated the report was "factually false" and that he had a "passionate" exchange when he received the report and was removed from the classes as a result. Father attempted to receive treatment from another provider because he was required to do so as a term of his probation, but was unable to do so. After Father completed his probation and the sex offender treatment was no longer required, CYFS did not communicate to him that it would be a necessary part of his service plan until after the October 2024 hearing.

¶ 30 Father testified that he attended counseling with Ogwal during the relevant period and said their sessions were positive and productive. Father also believed that visits with the minor went

11

well and that he demonstrated appropriate parenting skills. Father stated he missed a few visits during the relevant time period because he was assaulted by his wife's relatives. He testified that he completed his parenting class.

¶ 31 When asked if he believed he completed the service plan, Father stated, "I believe I completed every reasonable request that was in my service plan since this case started. I'm just not someone who just does whatever people say if it makes no sense to me." Father stated that it was "completely unreasonable and unproductive and a waste" of time to complete the sex offender treatment. When CYFS added the sex offender treatment to the service plan after Father completed probation, he called the service a "stumbling block" to his progress and said that he would not complete the service. Father stated, "They [CYFS] do not have the right to make me go to a class that I don't need to be based on an assessment that was over six months old and no longer relevant." Father chose to delay signing an additional consent form and wait for the assessment to become "invalid" even though he knew it could delay his case with the minor.

¶ 32 As to the misplaced consent form, Father stated that he signed the first release, and he was not going to comply again with CYFS's request. Father stated that when he resigned the consent form, he signed it when the assessment was no longer relevant and he signed it when it was "strategically time to." Father stated that he felt like he had a right not to agree to a service plan, but he then would "have to deal with the consequences of not signing or complying with those service plans." Father testified that he would never "take sex offender counseling or do another assessment again." When Father did not complete drug drops as ordered, he testified that he did not believe it was a violation of a court order because "when court orders are arbitrary and fanciful, they have no power of weight behind them."

¶ 33　After hearing argument from the parties, the circuit court addressed the factors it considered to determine Father's fitness. The circuit court stated that there was no residential stability during the relevant time period. Father also did not have stable employment. Father did not comply with drug screens despite a court order, and his noncompliance began prior to an order on his appeal for this service. Father attended counseling and was engaged in the service. Father attended visitation regularly, but did have some issues with needing redirection when speaking to the minor. Visitation, however, never progressed during the time period for several reasons, including homelessness and failure to complete the sex offender treatment class. Due to his guilty plea of criminal sexual abuse, Father completed a sex offender assessment and was found a moderate risk to reoffend. As a result, he was required to complete sex offender treatment and was unsuccessfully discharged because of his behavior. While it was not Father's fault that the initial consent form was misplaced, he still had a continuing obligation to sign another release, but chose not to do so for "strategic" reasons. This decision slowed down his progress in the case. He was unable to schedule an appointment with Kleppin as well due to his accusatory communication. The circuit court said, "This court can't and will not disregard the reality that despite [Father] maintaining his innocence, he was convicted of felony criminal sexual abuse." Father then was assessed and required to take a sex offender treatment class, and he did not complete that service during the time period.

¶ 34　The circuit court found that the State met its burden of proving all three counts by clear and convincing evidence. The circuit court focused on Father's testimony that he would only comply with services and court orders as he saw fit, and this caused his case with the minor not to progress. The court entered a written order finding Father unfit on December 19, 2026.

13

¶ 35    The court appointed special advocate (CASA) filed a report on January 23, 2026, which recommended that Father's parental rights be terminated in the best interests of the minor and adoption be pursued with his placement, his maternal grandparents. CYFS filed a best-interest report on January 15, 2026, which also recommended that Father's parental rights be terminated.

¶ 36    The circuit court held a best-interest hearing on January 30, 2026. Father did not attend the hearing, as he was in the custody of the Cook County Sheriff. A motion to continue was denied, as Father's counsel was present. The court stated that it reviewed both reports filed by the CASA and CYFS. The court took judicial notice of an order from this court, which remanded Father's criminal sexual abuse appeal due to noncompliance with admonishments. *People v. Wade*, 2026 IL App (5th) 231272-U. The State entered into evidence three exhibits, which were police reports from the Chicago Police Department. The reports all detailed Father's arrest accounts: the first was for possession of methamphetamine, the second was for domestic battery, and the third was for possession of suspected methamphetamine and possession of a weapon by a felon, with possible involvement with a death.

¶ 37    The State and the guardian *ad litem* argued that it was in the minor's best interest for Father's parental rights to be terminated and for the minor to remain living with his maternal grandparents. The circuit court agreed and found that it was in the best interest of the minor to terminate Father's parental rights. The court entered a written order on the same day. Father timely appealed.

¶ 38                                II. ANALYSIS

¶ 39    On appeal, Father argues that the circuit court's findings that Father (1) failed to maintain a reasonable degree of responsibility as to the minors' welfare, (2) failed to make reasonable

14

efforts, and (3) failed to make reasonable progress were against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 40    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Act (705 ILCS 405/2-29(2) (West 2024)), which delineates a two-step process to terminate parental rights involuntarily. The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds the parent unfit, the matter proceeds to a second hearing at which the State must prove that termination of parental rights is in the child's best interest. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352.

¶ 41    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *Id*. at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387,

15

391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 42 In this case, the State alleged three grounds for unfitness: failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024)); failure to make reasonable efforts to correct the conditions that were the basis for removal of the minor during any nine-month period (*id.* § 1(D)(m)(i)); and failure to make reasonable progress to correct the conditions that were the basis for removal of the minor during the nine-month period of February 7, 2024, to November 7, 2024 (*id.* § 1(D)(m)(ii)).

¶ 43 Reasonable progress is judged by an objective standard based on the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress exists when the circuit court can conclude that it will be able to order the child returned to parental custody in the near future. *Id.* However, a parent does not have an unlimited amount of time to make reasonable efforts or progress toward the return home of his children. *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 44 Father argues that he made good and continuing progress in mental health counseling, completed his parenting service, maintained contact with CYFS, and "continued to co-parent Junior [DJ] in constructive and responsible ways." We first note that Father's other son, DJ, is not a party to his case, and Father's parenting with DJ cannot reflect Father's progress in the minor's case. The circuit court noted that while Father did make some progress in his services, he did not make reasonable progress throughout the relevant time period.

16

¶ 45 Throughout the case, Father regularly did not comply with the terms of his service plan. When CYFS misplaced Father's original consent form, Father refused to sign an additional form as he did not want to "rescue CYFS from their incompetency." Father testified that his decision to wait to sign a new consent form was based on "strategy," as he waited until he believed the assessment would no longer be relevant six months after it was completed. Father made this decision despite the fact that he was aware his refusal to sign the consent form would delay his progress in the case, including visitation with the minor. The sex offender assessment and treatment were not initially included on Father's service plan, but this was because it was a requirement of Father's probation, so the agency did not see the need to require the same service twice. Father was aware that the sex offender treatment was part of his progress. Despite this, Father testified that he would never engage in sex offender treatment, nor would he comply with any services he believed to be "arbitrary and fanciful." Father enrolled in sex offender treatment during the time period, but was unsuccessfully discharged for not engaging in the treatment and becoming aggressive toward the providers, calling one provider a "lying bag of trash." Father was unable to begin services with another provider, Kleppin, due to scheduling and communication issues, including accusing Kleppin of being involved in corruption or conspiracy. Father maintained his innocence of the underlying offense requiring the treatment; however, he refused to engage in the service as required and in ways that the providers testified were available to him.

¶ 46 Father also did not comply with the drug tests required. Father did appeal this service and later had it removed, but he refused to complete the tests while the appeal was pending, despite the fact that they were still part of his service plan. Father stated that he felt like he had a right not to agree to a service plan, but he then would "have to deal with the consequences of not signing or complying with those service plans."

17

¶ 47    Father did not obtain stable housing or employment during this time. Father testified to the difficulties of finding housing due to being on the sex offender registry. However, Father stated that during this time, he did not seek employment because he was focused on four pending lawsuits against Champaign County. Because he proceeded *pro se*, all his time and focus were spent on the lawsuits. Father testified that his wife covered his living expenses so that he could do this. This decision, however, prevented Father from obtaining gainful employment as required by his service plan. He further did not obtain housing during this time, living in a hotel or with family and friends, while he remained homeless in Champaign and Chicago.

¶ 48    Due to Father's failure to progress in his service plan, visitation with the minor never increased and remained supervised at the CYFS office or other community locations. Schmohe opined that at the end of the relevant period, CYFS was not close to returning the minor to Father because of his failure to progress in the case. See *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 49    Based on these facts, the circuit court determined that the State proved by clear and convincing evidence that Father failed to make reasonable progress during the relevant nine-month period. Evidence of a single statutory ground is sufficient to uphold a finding of parental unfitness. *In re T.Y.*, 334 Ill. App. 3d 894, 905 (2002). Accordingly, we conclude that the circuit court's finding that Father was unfit was not against the manifest weight of the evidence. Because we may affirm the circuit court's finding of unfitness on this ground alone, we need not address Father's remaining arguments concerning the other statutory grounds for his unfitness. See *In re Gwynne P.*, 215 Ill. 2d at 363.

¶ 50    Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d at 364. The parent's interest in

18

maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. As with the circuit court's findings at the unfitness stage, we afford the circuit court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *Id.* ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 51　　Father does not argue on appeal that it was not in the minor's best interest to terminate his parental rights. As such, the circuit court's termination of Father's rights was not against the manifest weight of the evidence.

¶ 52　　　　　　　　　　　　　　III. CONCLUSION

¶ 53　　For the foregoing reasons, the circuit court's orders of unfitness and termination of Father's parental rights are affirmed.

¶ 54　　Affirmed.